Judgment rendered February 26, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,052-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SUCCESSION OF
JOHN GARNER LYNCH

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 632,448

Honorable Brady D. O'Callaghan, Judge

* * * * *

| | |
|---|---|
| MIRAMON LAW, INC. | Counsel for Appellants, |
| By: Patricia N. Miramon | Susan Carol Lynch Hunt, |
| Julia Miramon Todd | Martha Elizabeth Lynch |
| Connor J. Hargrave | Riley, Nathan Hammett, |
| | and Katie Elizabeth |
| | Smith |
| | |
| CHARLES TAUNTON MELVILLE | Counsel for Appellee, |
| | Succession of John Garner |
| | Lynch |
| | |
| AYRES, SHELTON, WILLIAMS, | Counsel for Appellee, |
| BENSON & PAINE, LLC | Rudy Allen Nolin |
| By: Lee H. Ayres | |
| Alexandra E. Vozzella | |
| | |
| THOMAS, SOILEAU, JACKSON | Counsel for Appellee, |
| & COLE, LLP | Martha Crosslin |
| By: Erica M. Ducoing | |

* * * * *

Before PITMAN, THOMPSON, and ELLENDER, JJ.

THOMPSON, J., dissents with written reasons.

**PITMAN, C. J.**

Intervenors-Appellants Susan Carol Lynch Hunt, Martha Elizabeth Lynch Riley, Nathan Hammett and Katie Elizabeth Smith appeal the trial court's judgment in favor of Defendants-Appellees Rudy Allen Nolin and Martha Crosslin. For the following reasons, we affirm.

## FACTS

On September 2, 2021, Nolin filed a petition to probate the last will and testament (the "will") of John Garner Lynch ("Decedent"), who passed away on August 31, 2021. He requested to be appointed independent executor. The will was in notarial form, dated March 19, 2018. In the will, Decedent gave his entire estate to his wife Katherine Lynch (his "Wife") and made no provision for his children. He nominated his Wife to be independent executrix of the will and nominated Nolin and then Crosslin as successor executors. In the affidavit of death, domicile and heirship, Nolin stated that Decedent was married four times, most recently to his Wife, who predeceased him and with whom he had no children. He had six children—Hunt and Riley, who survived him, and four who predeceased him—and two grandchildren. On September 6, 2021, the trial court admitted the will to probate and confirmed Nolin as independent executor.

On October 5, 2021, Intervenors[1] filed a petition for intervention and rule for accounting/discharge, naming Nolin as a defendant. They stated that in the will, Decedent gave his entire estate to his Wife, who predeceased him by one week, and made no alternative provisions for inheritance. Therefore,

---

[1] Only Hunt and Riley filed the petition to intervene. Nolin filed an exception of nonjoinder of required parties, stating that Decedent's grandchildren—Hammett and Smith—are required parties. Hammett and Smith joined Hunt and Riley on subsequent filings.

they contended that they are entitled to inherit his entire estate and requested to be recognized as owners and sent into possession of all Decedent's property and assets. They stated that they had been informed that a trust may have been prepared for Decedent. They contended that if a trust were prepared but not executed, it would not be deemed valid, and if a trust were executed but no transfer of assets had been made to it, it should be deemed invalid. They requested that Nolin provide a full accounting and list of all the property and assets of the estate that are in his possession or under his control. They further asked that Nolin be discharged as administrator and that they be designated as the substitute administrators.

On November 12, 2021, Nolin filed peremptory exceptions of no right of action and no cause of action. He first provided information about the trust referenced by Intervenors. He stated that on March 19, 2018, Decedent executed a durable power of attorney (the "POA") and appointed his Wife as agent, Nolin as successor agent and Crosslin as an additional successor agent. He noted that the POA authorized the agent to form trusts and transfer Decedent's property. He stated that after Decedent's Wife passed away, he told his attorney that he did not want to leave any of his property to his children. Nolin explained that because no one could visit Decedent in the hospital, he could not execute a new will, so the POA was used to transfer all his property to a revocable trust. Nolin declined to serve as agent on August 27, 2021, and Crosslin accepted the appointment on this date and created the John Garner Lynch Trust (the "Trust"). Nolin explained that Decedent was named the beneficiary of the Trust for the remainder of his life and that at his death, the Trust would be for the primary benefit of Nolin and the secondary benefit of other named friends. Nolin was named the

2

trustee; and on August 27, 2021, Crosslin as agent transferred Decedent's property to Nolin as trustee by an Act of Assignment and Warranty Deed. Nolin accepted the transfers between 10:00 and 10:15 a.m. on August 31, 2021, and Decedent passed away at 2:12 p.m. that day. He stated that there were clerical errors in the Warranty Deed, including incorrectly naming the trust as the "John Garner Trust," but that these errors were corrected by a Notarial Act of Correction and did not affect its validity.

Nolin then addressed his exceptions. He stated that Intervenors have no right of action to demand an accounting because all Decedent's assets were transferred to the Trust and are not part of the estate's assets. He contended that the heirs of the estate have no ownership interest in this property and no right to demand an accounting. He also argued that Intervenors have no cause of action to remove him as independent executor.

On August 12, 2022, Intervenors filed a petition to annul and an amended petition to remove executor and for accounting and named Nolin and Crosslin as defendants. They argued that Decedent was not capable of directing the actions of Nolin and Crosslin regarding the POA and the Trust. They contended that the actions of Nolin and Crosslin were not authorized by the POA, which could not be used to allow them to self-deal and ultimately transfer all Decedent's assets to Nolin. They argued that as executor, Nolin acted in his own interest and not in the interest of the heirs to the estate. They requested that Nolin be removed as executor and that Hunt be appointed independent executor, or in the alternative, that the court appoint an independent third-party executor. They stated that they had suffered damages due to the actions of Nolin and Crosslin, including financial losses in former estate assets, deprivation of their right to estate

3

assets and income generated from those assets, as well as legal and professional fees and costs.

On April 4, 2023, Intervenors filed a petition for declaratory judgment. They stated that Decedent had bank accounts that formed an IRA (the "IRA") that had no beneficiary and were not transferred to the Trust. They contended that the IRA fell intestate, so they should be recognized as owners.

On April 14, 2023, Nolin filed exceptions and an answer to Intervenors' petition. He stated that Intervenors failed to state a cause of action for his removal as executor and that they have no right of action to demand an accounting of the administration of the Trust. He denied Intervenors' allegations and requested judgment in his favor, dismissing their claims with prejudice.

On April 17, 2023, Crosslin filed exceptions and an answer to Intervenors' petition. She stated that Intervenors failed to state a cause of action, or alternatively, have no right of action, to demand an accounting from her. She also argued that Intervenors have no right of action to nullify the creation of the Trust, any donation to the Trust or any action taken by her related to the Trust. She contended that Intervenors' claim that she took unauthorized action is too vague to allow her to properly answer. She denied Intervenors' allegations and requested judgment in her favor, dismissing their claims with prejudice.

On May 15, 2023, a hearing was held on Nolin and Crosslin's exceptions and Intervenors' petition to remove executor and for accounting. On June 15, 2023, the trial court filed a judgment. It granted Nolin's exception of no right of action related to Intervenors' request for an

accounting of the Trust and dismissed their claim with prejudice. It denied Nolin's exception of no cause of action related to Intervenors' request for his removal as executor. It granted Interventors' request to remove Nolin as independent executor, denied their request to appoint Hunt as executrix and named a third-party executor. It ordered Nolin to file an accounting of any actions he took pursuant to his authority as executor and any transactions passing through the estate account within 45 days. It granted Crosslin's exception of no cause of action related to Intervenors' request for an accounting of actions taken by her as agent and dismissed Intervenors' claim without prejudice. It denied Crosslin's exception of no right of action related to Intervenors' request to nullify the Trust and referred it to the merits. It granted Crosslin's exception of vagueness and granted Intervenors 30 days to amend their petition.

Intervenors amended their petition against Crosslin. They alleged that she engaged in numerous acts that exceeded her appointment as agent, including that she used the POA to create the Trust, which was not used for the benefit of Decedent's descendants and when Decedent was not interdicted; that she attempted to transfer Decedent's property to the Trust, when the Trust is not for the benefit of Decedent's descendants; and that she attempted to donate Decedent's entire estate to the Trust, in violation of La. C.C. art. 1498.

On June 29, 2023, Crosslin filed an answer and requested judgment in her favor and that the Intervenors' claims be dismissed with prejudice.

A bench trial was held on October 12, 2023. Creighton Hodges, CPA, testified that John Williams, Decedent's attorney, contacted him after Decedent's death to prepare Decedent's tax returns for 2018, 2019, 2020 and

5

2021. He determined that the total amount of federal taxes and penalties due for the years 2018 to 2021 was $122,789, and the total amount for the state was $28,601.

Crosslin testified that she had been friends with Decedent since the 1980s. She was a nurse at the hospital where Decedent received his final medical care and saw him three times while he was hospitalized. She noted that on August 27, 2021, Decedent was in "very bad shape" in the ICU on high-flow oxygen but that he was not on a ventilator. On that day, she signed the acceptance of the appointment to act under the POA. She noted that she never told Decedent that she signed the acceptance and that they did not discuss creating the Trust. She believed she had the ability to create the Trust using the POA. She recalled signing the Act of Assignment to transfer his assets to the Trust and the Warranty Deed to transfer his land to the Trust. She opined that Decedent was unable to execute the documents himself due to COVID-19 regulations and not being able to have visitors in the hospital. She remembered Decedent telling her that if something happened to him and his Wife, he wanted Nolin to take care of business for him. She noted that Decedent did not want his belongings to go to his children and that his will reflected this.

On cross-examination, Crosslin identified Decedent's 2014 will in which his previous wife (Marlene, who predeceased him) was named the sole legatee and he made no provisions for his children. Crosslin also identified his 2018 will in which she and Nolin were named as alternate independent executors after his Wife. She explained that Decedent did not want to leave anything to his children and that he trusted her and Nolin to do what he wanted. She noted that his relationship with his children worsened

6

over the years, and he wanted his Wife to receive everything. Crosslin testified that when Decedent and his Wife were both hospitalized with COVID-19, she spoke with Decedent, who had full mental capacity, and recommended that he contact Williams to "get everything straightened out." She explained that Williams recommended creating the Trust to protect Decedent as his health deteriorated.

Nolin testified that he and Decedent were best friends for 50 years. He noted that he was named executor of Decedent's 2018 will, in which the only beneficiary was his Wife. He stated that Decedent asked him to take care of his assets, so he spoke to Decedent's attorney, which led to the creation of the Trust. He did not discuss the creation of the Trust with Decedent because Decedent was hospitalized and could not receive visitors. He stated that as trustee he signed documents accepting Decedent's property to the Trust.

On cross-examination, Nolin stated that Decedent made him an alternate executor because he trusted him. He recalled that Decedent did not trust his children and did not want to leave them anything. He testified that Decedent was hospitalized with COVID-19 in August 2021, that they regularly spoke on the telephone during this time and that nothing made him question Decedent's mental capacity. He spoke to Decedent and Williams on the telephone on August 26, 2021, and Decedent stated that he did not want his daughters to receive anything and noted several friends who he wanted to receive money and specific items, including guns and equipment. Nolin testified that he signed the Trust agreement, Act of Assignment and Warranty Deed on August 31, 2021, before Decedent passed away.

Williams, Decedent's attorney, testified that the only legatee in the will was his Wife, who predeceased him, and that it named no alternate legatees. He recalled that Decedent did not believe he would outlive his Wife. He confirmed that the POA first named his Wife, then Nolin as alternate and then Crosslin as second alternate. Williams testified about a telephone conversation between him, Nolin and Decedent while Decedent was hospitalized. They discussed Decedent's wishes for his estate, as his Wife had passed away, and he did not want his children to receive anything and wanted everything to go to Nolin, with instructions for Nolin to provide financially for several friends and to give guns to another friend. Williams stated that based on this discussion, he designed a plan to use the POA to create the Trust. He noted that Decedent never stated that he wanted a Trust and was likely unaware that one had been created. He stated that Nolin resigned as agent and Crosslin accepted the agency and signed for the creation of the Trust.

On cross-examination, Williams stated that he first met Decedent in 2014 and had multiple conversations with him over the years about his wishes for his estate. When he prepared Decedent's 2014 will, Decedent told him that he did not want his children or grandchildren to receive anything, and the same was true when he prepared Decedent's 2018 will. He testified that the POA authorized the agent, i.e., Crosslin, to create the Trust and to transfer Decedent's property. He stated that Crosslin is not a beneficiary of the Trust and has not engaged in any self-dealing. He also stated that nothing prohibits Nolin from serving as trustee and being named as a secondary beneficiary and that he does not believe Nolin has engaged in any self-dealing. Williams stated that Decedent's IRA was not transferred to

the Trust and recalled that there is approximately $450,000 in the IRA, which is sufficient to pay Decedent's taxes. He stated that he did not believe Decedent's Texas property was transferred to the Trust.

Riley, Decedent's daughter, testified that she thought she had a good relationship with her father. She stated that before she moved to Kentucky in 2017, she helped take care of him. After her move, they talked on the telephone once or twice a month. She stated that she spoke to Decedent when he was in the hospital and that she also spoke to Nolin. She testified that Decedent "always" asked her what she wanted in the event of his death, and she responded that she did not want anything. She was aware that Decedent planned to leave everything to his Wife, and she told her father that she would not do anything to disrupt this from happening. She stated that Decedent never mentioned what would happen if his Wife predeceased him because he was sure she would outlive him. She testified that she did not know anything about the creation of the Trust and that when she asked Nolin about the will, he said there was no will. She also asked Nolin if she could go to her father's house, and he said no.

Hammett, Decedent's grandson, testified that his parents never married, so he did not meet his grandfather until he was older and seeking out his father. He stated that he saw his grandfather three times before his death and that they had nice visits. He recalled that during the first visit, Decedent told him that if he was looking for money, he was not going to receive any. Hammett responded that he was not there for money but to meet his father's family. On cross-examination, he agreed that the last time he saw Decedent was in 2018 or 2019.

9

On December 1, 2023, the trial court filed a judgment. It noted that Decedent's desires are clear and he had no intention of leaving any of his property to his heirs. It stated that due to Decedent's Wife's death and his own final illness, he was unable to execute a testament reflecting his wishes, so he equipped his friends, Nolin and Crosslin, with legal means to achieve his desires regarding his possessions. It reviewed the POA and determined that Decedent trusted his Wife, Nolin and Crosslin with the broadest possible authority over his affairs and executed a valid POA conferring such authority. It also determined that the Trust was validly created. It stated that the parties agreed that Decedent's property in Texas and his IRA were not properly transferred to the Trust, so they will ultimately be distributed to the heirs under the law of intestacy. The court noted that these assets are more than sufficient to cover any debts of the succession. It determined that all other property, both movable and immovable, was validly transferred to the Trust. Regarding the error in the name of the Trust in the Warranty Deed, the court found that the Notarial Act of Correction was appropriate but unnecessary and that the public records doctrine cannot be extended to thwart Decedent's wishes. Accordingly, the trial court decreed that the Trust was validly created and that the Act of Assignment and Warranty Deed transferred Decedent's assets to the Trust, not including his IRA or property in Texas. It denied Intervenors' petition to annul and dismissed it with prejudice.

On December 21, 2023, the trial court designated the December 1, 2023 judgment to be a final judgment.

Intervenors appeal.

10

## DISCUSSION

*Power of Attorney and Creation of the Trust*

Intervenors argue that the trial court erred when it found that Nolin and Crosslin could use the POA to create the Trust. They contend that the POA allows for the creation of a trust for the benefit of Decedent's children, their descendants and their spouses or if Decedent were interdicted, but that neither circumstance was present. They argue that Nolin's purpose was to manage and protect the assets, not to become the ultimate beneficiary.

Nolin and Crosslin argue that the trial court correctly determined that the Trust was validly created. They explain that the POA expressly and clearly authorizes Crosslin as agent to create the Trust and transfer assets to it. They contend that the evidence and testimony presented at trial clearly show that the creation of the Trust and subsequent transfer of assets to it were done for the purpose of accomplishing Decedent's expressed wishes. They note that in every circumstance Decedent could have included provisions for Intervenors to inherit, he specifically chose not to do so.

"Power of attorney" is a common law term whose equivalent civilian term is "procuration." La. C.C. art. 2986, Revision Comments (a); *Succession of Conville v. Bank One, Louisiana, N.A.*, 40,506 (La. App. 2 Cir. 1/25/06), 920 So. 2d 397. A procuration is a unilateral juridical act by which a person, the principal, confers authority on another person, the representative, to represent the principal in legal relations. La. C.C. art. 2987. A procuration is subject to the rules governing mandate to the extent that the application of those rules is compatible with the nature of the procuration. La. C.C. art. 2988.

Under the rules of mandate, the principal may confer on the representative general authority to do whatever is appropriate under the circumstances. La. C.C. art. 2994. The authority to alienate, acquire, encumber or lease a thing must be given expressly. La. C.C. art. 2996. La. C.C. art. 2997 sets forth additional instances when the principal must give express authority to the representative. Self-dealing also requires express authorization by the principal. La. C.C. art. 2998; *Matter of Succession of Frazier*, 54,751 (La. App. 2 Cir. 9/21/22), 349 So. 3d 634.

As a procuration or power of attorney is a contract, we interpret its provisions pursuant to the rules of contract interpretation. When a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law. *Sims v. Mulhearn Funeral Home, Inc.*, 07-0054 (La. 5/22/07), 956 So. 2d 583. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. Powers of attorney are construed strictly and no special authority is implied by the general terms of a procuration except ordinary powers of administration. *Matter of Succession of Frazier*, *supra*.

We note that at first glance, the facts of this case might appear suspicious—that a POA was used to create the Trust and transfer assets to it hours before Decedent passed away while hospitalized in isolation with COVID-19, resulting in his heirs not receiving the bulk of his estate and, instead, his best friend being designated as the trustee and primary beneficiary of the Trust following his death. However, the testimony and evidence presented at trial remove this suspicion and reveal that the actions

taken by Williams, Nolin and Crosslin in the days leading up to Decedent's death were authorized by a valid POA and were for the purpose of fulfilling Decedent's wishes for his property.

In the POA, Decedent, as the principal, granted his representative the following authority, as is relevant to this appeal:

> [T]o do any and every act and to exercise any and every power that Appearer could do or exercise if present and acting for himself and in his own right, including not only all matters of administration, but also all acts of ownership and the doing of whatever may appear to Agent to be conducive to the interest of Appearer.
>
> Without in any manner limiting or restricting any of the foregoing, Appearer hereby grants unto Agent, for Appearer and in Appearer's name, place and stead, full power and authority:
>
> ***
>
> 2. To do the following things and perform the following acts with respect to Appearer's interest or a part thereof, or an undivided interest therein, in all kinds of things or property, whether movable or immovable, personal or real, corporeal or incorporeal, tangible or intangible, wheresoever situated, and whether now owned or hereafter acquired:
>
> ***
>
> > f. To exchange, sell, convey, assign or otherwise dispose of the same in any manner, including but without being limited to making dations en paiement and gratuitous, onerous or remunerative donations of the same;
> >
> > ***
>
> 14. To form or cause to be formed, or join with any other person or persons in forming or causing to be formed, one or more partnerships, limited liability companies, corporations, trusts, and other business entities, in any manner, on any terms and conditions, and for any capitalization, duration or purpose authorized by the laws applicable thereto; to execute, as one of the partners, members, incorporators, trustees, or settlers, proper organizational documents, including without limitation, articles of incorporation, articles of partnership, articles of organization, and to execute any and all other papers which Agent may deem necessary or desirable to effect such formation or in connection with such formation; and to exchange cash or property of any amount or value belonging to Appearer for any form of general or limited interest, or class or amount of stock or other evidence of ownership or membership in such entity, or for any bonds, notes or other evidences of indebtedness of such entity;

13

***

17. To make gifts, grants, or other transfers without consideration, either outright, in trust or otherwise to or for the benefit of Appearer's children and their descendants, the spouses of all of Appearer's descendants, and such other persons as Agent may determine to be in Appearer's best interest or in the best interest of Appearer's estate, including but not limited to gifts that will be eligible for the annual gift tax exclusion in Section 2503(b) of the Internal Revenue Code (IRO) as it now appears or may be hereafter amended, and gifts of tuition costs and medical costs in accordance with IRC Sections 2503(e) and 2611(b)(1), as they now appear or may be hereafter amended, as well as taxable gifts that may use up Appearer's unified credit during lifetime as the same is defined in IRC Section 2010 as it now appears or may be hereafter amended, as well as gifts to charities and the making or fulfillment of charitable pledges, and to elect split-gift giving in accordance with IRC Section 2513 as it now appears or may be hereafter amended; provided, however, that Agent shall have no power or authority to make a gift to herself, her estate, or her creditors or a gift which directly or indirectly relieves her of a support obligation.

***

21. To sell, transfer and convey all of Appearer's interest in and to any immovable property for such consideration and on such terms and conditions as Agent shall deem proper in her unrestricted discretion; said Agent shall also have full authority and power to execute on Appearer's behalf such contracts to sell, settlement statements, affidavits, declarations and other contracts and documents as in Agent's judgment are proper so as to effectively and completely convey title to immovable property.

As is clearly evident in these sections of the POA, Decedent gave his representative express authority to form a trust and to transfer his assets. A reading of the full text of Section 17 confirms that Intervenors incorrectly contend that a trust created and transfers made by the POA must be for the benefit of Decedent's children, their descendants and their spouses. As Nolin and Crosslin correctly argue, Sections 14 and 17 provide that the agent may form a trust and transfer assets for the benefit of such persons as the agent determines to be in Decedent's best interest or in the best interest of his estate. The actions taken by Crosslin as agent to create the Trust and

14

transfer property to it were for Decedent's best interest and the best interest of his estate and fulfilled his express wishes.

In the POA, Decedent named his Wife as his agent and then named Nolin and then Crosslin as alternate agents. Notably, he did not name any of his children or grandchildren as alternate agents. As Nolin and Crosslin testified, Decedent named them as alternate agents because he trusted them to carry out his wishes, which included that he did not want his children to receive any of his belongings. This is consistent with Decedent's 2014 and 2018 wills in which he named his then-wives as the sole legatee; named his then-wives as executrix and Nolin and Crosslin as alternate executors; and made no provisions for his children. Williams testified that in their discussions about Decedent's wishes for his estate when preparing these wills, Decedent stated that he did not want his children or grandchildren to receive anything. Nolin and Crosslin provided consistent testimony regarding Decedent's trust in them as alternate executors and their understanding that he did not want to leave anything to his children. Riley also testified that she was aware of Decedent's wish to leave everything to his Wife, and Hammett testified that Decedent told him that he would not receive any money.

With his understanding of Decedent's testamentary requests and POA, Williams directed a plan to effectuate Decedent's wishes through the creation of the Trust and transfer of assets to it. The creation of the Trust and, as discussed below, the transfer of assets to it fulfills Decedent's desire to prevent his children from inheriting, save for the IRA and Texas property that were not transferred to the Trust.

15

Although Intervenors question Nolin and Crosslin's actions regarding the POA's prohibition on self-dealing, Williams, Nolin and Crosslin ensured that self-dealing would not occur. Nolin declined to serve as an agent for Decedent on August 27, 2021; and, after this declination, Crosslin accepted the appointment. Crosslin then created the Trust and transferred Decedent's property to it. At trial, Williams explained that Crosslin has not engaged in any self-dealing because she is not a beneficiary of the Trust. He also noted that Nolin has not engaged in any self-dealing as a trustee or secondary beneficiary of the Trust. At the time of the creation of the Trust and the transfer of assets to it, Decedent was the primary beneficiary of the Trust as he was still living.

Therefore, the trial court was not manifestly erroneous in determining that Decedent executed a valid POA and that Crosslin was authorized by this POA to create the Trust and transfer assets to it in order to fulfill Decedent's clear wishes regarding his possessions. We emphasize that this result is fact-specific to this case and does not stand for a general proposition that a procuration takes precedence over a testament. This case presents a unique situation where Decedent's wish that his heirs receive nothing was unrefuted; he took steps after the death of his sole legatee and while he was isolated in the hospital with his final illness to ensure that his desires were fulfilled; and that he had previously granted a broad POA giving his agent the authority to create a trust and transfer his assets to it.

Accordingly, this assignment of error lacks merit.

*Transfer of Assets*

Intervenors raise four assignments of error in which they argue that the trial court erred in determining that Decedent's movables and

immovables, save his property in Texas and IRA, were validly transferred to the Trust. They contend that the Act of Assignment is invalid because it attempts to transfer all Decedent's property to the Trust, in violation of La. C.C. art. 1498. They argue that Decedent's movables were not validly transferred to the Trust because there was no actual transfer or delivery of them. They contend that Decedent's immovable property located in Louisiana was not validly transferred to the Trust by the Warranty Deed because the Trust instrument was not recorded until after Decedent's death and, therefore, had no effect against them as third parties. They further allege that the Notarial Act of Correction could not be used to change the name of the Trust in the Warranty Deed. Accordingly, they contend that all Decedent's property remained in his estate and was inherited by them.

Nolin and Crosslin argue that the trial court correctly determined that the transfers of assets by the Act of Assignment and Warranty Deed to the Trust were valid. They contend that there is no requirement that the trustee be in possession of the assets at Decedent's death for the transfer to be valid and that the non-recordation of the Trust instrument has no effect on the validity of the transfers of property to the Trust. Therefore, they argue that Intervenors did not come into any rights in Decedent's estate at his death because the Act of Assignment and Warranty Deed effected valid transfers of his property to the Trust.

A trust is the relationship resulting from the transfer of title to property to a person to be administered by him as a fiduciary for the benefit of another. La. R.S. 9:1731. The provisions of the Louisiana Trust Code shall be accorded a liberal construction in favor of freedom of disposition. La. R.S. 9:1724. An inter vivos trust is created upon execution of the trust

17

instrument. La. R.S. 9:1822. A trustee's acceptance is retroactive to the date of creation of the trust. La. R.S. 9:1823. Whenever possible a trust instrument will be construed so as to uphold the validity of the trust and render the instrument effective. *Grant v. Grant*, 35,635 (La. App. 2 Cir. 2/27/02), 810 So. 2d 1226, *writ denied*, 02-1046 (La. 6/14/02), 817 So. 2d 1158.

The trust instrument is not required to contain specific language of conveyance provided it is clear that title is being transferred to the trustee, because the creation of a trust automatically and by definition effects a transfer of title to the trust property pursuant to La. R.S. 9:1731. *Grant v. Grant*, *supra*. The trust instrument must identify the property being transferred in trust either specially, as in a description of land, or generally, as under a universal legacy. *Id*. A universal legacy is a disposition of all of the estate. *Id*.

An instrument that transfers an immovable is without effect as to a third person unless the instrument is registered by recording it in the appropriate mortgage or conveyance records. La. C.C. art. 3338. La. R.S. 9:2092 discusses the recordation of a trust that includes immovables and states in pertinent part:

> A. If at any time the trust property of either an inter vivos trust or a testamentary trust includes immovables or other property the title to which must be recorded in order to affect third persons, a trustee shall file the trust instrument, an extract of trust, or a copy of the trust instrument or extract of trust certified by the clerk of court for the parish in which the original trust instrument or extract of trust was filed, for record in each parish in which the property is located. Nevertheless, if the trust instrument contains a transfer of immovable property or other property the title to which must be recorded in order to affect third persons, a trustee shall file the trust instrument for record in the parish in which the property is located.

The public records doctrine is founded upon our public policy and social purpose of assuring the stability of land titles. *Biggs v. Hatter*, 46,910 (La. App. 2 Cir. 4/11/12), 91 So. 3d 1148, *writ denied*, 12-1075 (La. 9/21/12), 98 So. 3d 337. The doctrine does not create rights in a positive sense but, rather, has the negative effect of denying the effectiveness of certain rights unless they are recorded. *Id*. It is essentially a negative doctrine. *Id*. Third persons are not allowed to rely on what is contained in the public records but can, instead, rely on the absence from the public record of those interests that are required to be recorded. *Id*. Simply put, an instrument in writing affecting immovable property which is not recorded is null and void except between the parties. *Id*.

Section 7.1 of the Trust states:

> Property acceptable to the Trustee may be transferred to any trust created by this Agreement from time to time in the future by Grantor or by any other person (including additions pursuant to the provisions of the last will of any person). The transfer may be by any means. Such property, if accepted by the Trustee, shall be held, administered, and distributed pursuant to the terms of this Agreement.

Through the Act of Assignment, Crosslin as agent transferred to Nolin as trustee:

> [A]ll of the property which he owns (hereinafter referred to as the "Property"), specifically including all immovable and/or real property located in the State of Louisiana and the State of Texas, and all movable and/or personal property, whether or not titled, including all financial accounts of any nature and all guns, vehicles, and equipment.

Through the Warranty Deed, Crosslin as agent transferred to Nolin as trustee all Decedent's "right, title and interest in and to the property" listed in the attached exhibit, which described four immovable properties in Louisiana.

The parties and trial court agree that these documents did not transfer Decedent's immovable property in Texas or his IRA.

As discussed above, Crosslin had the authority as agent under the POA to transfer Decedent's assets. These transfers and acceptances occurred prior to Decedent's death on August 31, 2021. On August 27, 2021, the Trust was created and Crosslin as agent signed the Act of Assignment and Warranty Deed, and Nolin as trustee signed these documents, accepting the transfers, on August 31, 2021. Nolin testified at trial that he accepted the Trust and these transfers during the lifetime of the donor, as he signed the documents on the morning of August 31, 2021, before Decedent passed away that afternoon.

Intervenors rely upon statutes that apply to sales in their argument that the trustee be in possession of the assets at the time of Decedent's death for the transfer to be valid. They also rely upon a statute that applies to donations to argue that the Act of Assignment is invalid because it attempts to transfer all Decedent's property to the Trust. These statutes are inapplicable to the transfers made by the Act of Assignment. In accordance with Louisiana jurisprudence, *see Grant v. Grant*, *supra*, and Section 7.1 of the Trust, the Trust was not required to contain any specific language of conveyance, a universal disposition of all the estate was permitted and the transfers could be made by any means. Therefore, the trial court was not manifestly erroneous in its determination that the transfer of all Decedent's movables to the Trust was valid.

Regarding the transfer of Decedent's immovable property in Louisiana, Intervenor's arguments also are not persuasive. Although they argue that the Warranty Deed is defective because it states that the grantee is

20

"Nolin, in his capacity as the trustee of the John Garner Trust" rather than of the "John Garner Lynch Trust," the signature line correctly states the name of the Trust. There was clearly an understanding between the parties as for what Trust Nolin was accepting the transfer of immovable property. This court need not determine whether the Warranty Deed was invalid under the public records doctrine because the public records doctrine does not apply to Intervenors. Intervenors are not third persons as contemplated by the public records doctrine because they are Decedent's heirs. Therefore, the trial court was not manifestly erroneous in determining that Decedent's immovable property located in Louisiana was validly transferred to the Trust.

Accordingly, these assignments of error lack merit.

## CONCLUSION

For the foregoing reason, we affirm the judgment of the trial court in favor of Defendants-Appellees Rudy Allen Nolin and Martha Crosslin. Costs of this appeal are assessed to Intervenors-Appellants Susan Carol Lynch Hunt, Martha Elizabeth Lynch Riley, Nathan Hammett and Katie Elizabeth Smith.

**AFFIRMED.**

**THOMPSON, J., dissents.**

I respectfully dissent from the majority's opinion and write to express my concern that condoning these efforts to use a power of attorney to transfer all of an individual's assets in last few days and hours of his life will embolden and empower those who would seek to do the same for their own personal gain. While self-enrichment was not the motive in the present matter, that was certainly a result. I believe the agent exceeded her authority and improperly used the power of attorney, without such direction from Lynch, when she created a trust and conveyed much of Lynch's property to it immediately before his death. Those acts should be declared nullities. I also believe the collaboration between the trustee and the agent in these conveyances is contrary to the prohibition of self-dealing, and the conveyances to the trust should likewise be declared nullities.

In support of the conclusions reached above, I will reference in record some of the evidence and testimony confirming: (1) that Lynch fully understood his children would inherit through intestacy under his 2014 and 2018 testaments if his current wife were to predecease him; (2) the "telephone call" was not about estate planning; and (3) "The Plan" violates the fiduciary duty owned by the agent.

**Lynch Knew His Children Would Inherit Through Intestacy**

I do not subscribe to the notion that Lynch was completely estranged from his children, that he wanted to disinherit them, or that he hoped to overcome their rights to inherit through intestacy should his wife predecease him. Testimony at trial confirmed that Lynch's relationship with his children during his third marriage was "better." However, the record indicates that in 2018, at the age of 82, when he married for the fourth time,

1

his contact with his children apparently deteriorated.  His friend Crosslin testified that despite years of her and her husband having regular visits and contact with Lynch, even she did not see much of Lynch or spend as much time at his home[2] after his fourth marriage.  She testified, "I think his relationship was different with everybody after he married Kathy."[3]

Crosslin and Nolin testified that Lynch's fourth wife allowed the condition of a mobile home to become uninhabitable, which required Lynch and his wife to have to move.  Crosslin and Nolin also testified that during Lynch and his wife's hospitalizations, and immediately following her death, that her drug-addicted friends and family were taking items from Lynch's home, which necessitated shutting the gates and locking everything down.[4]  I assert this testimony about the nature and circumstances of Lynch's fourth marriage is a reason he had a strained relationship and infrequent contact with his children at that point of his life.

The applicability and effects of our laws of intestacy were known to Lynch.  The record shows that Lynch had a full knowledge and understanding that his children would inherit under both his 2014 and 2018 testaments if his wife predeceased him.  Lynch never took steps to alter or interfere in that certainty, even after outliving two previous wives.

At least twice Lynch received advice and instruction from his attorney on the controlling law of intestacy.  He also received advice from two long-term friends about effectively disinheriting his children and naming an alternate beneficiary in his wills.  It appears to this writer that Lynch's

---

[2] R.P. 927.
[3] R.P. 928.
[4] R. P. 896.

2

decision to never act on that information or advice from his friends was consistently intentional.  I suggest we should accept Lynch's actions as purposeful and as the best evidence of his intentions.

The record contains ample evidence confirming Lynch understood the results of the language contained in his 2014 and 2018 wills may benefit his children through intestacy.  In his 2014 will, Lynch named his spouse as his universal legatee and made no specific bequest to anyone else.  Regarding his children, Mr. Lynch's 2014 testament simply provided:

> I have not made any provisions herein for any children I now have and all children of mine who may survive me, and the birth of a child of mine, or the adoption of a child by me, hereafter shall not revoke this will.

This provision does not disinherit his children.  They still stood to inherit though intestacy, and Lynch knew it.

Williams testified regarding the language of Lynch's 2014 testament and his appreciation of its effect.  Williams had the following conversation[5] with Lynch:

> Q: Mr. Williams, at the time that you were asked to prepare this Will that we identified as Exhibit 1A, what -what did you discuss with Mr. Lynch?
>
> A: Who he wanted to leave his estate to. And he told me he wanted to leave it to his wife at the time, which was referred to as Marlene. I asked him at the time, I said, "What if she doesn't survive you?" And I still remember, John was sitting there in overalls, and pointed to his belly and said, look at me. "I don't - I don't think that I'll survive her. **So, I'm not worried about where it goes if she doesn't survive me.**"

(emphasis added).

That wife did not survive Lynch; she died in March of 2015.  For the three years after her death, and until Lynch's March 2018 will became

---

[5] R. P. 824, l. 30 – R. P. 825, l. 8.

3

effective, the provisions of his 2014 will were still in effect. If Lynch had died during this time period, then his estate would have gone to his children through intestacy. Lynch never revised his will during that time, never added a codicil naming an alternate legatee, and did not undertake efforts to disinherit his children.

In 2018, after the marriage to his fourth wife, Lynch had Williams update his will and power of attorney. The 2018 will had identical provisions to his 2014 will, with the exception of naming his current wife as his universal legatee. The 2018 will also included the same statement regarding his children. What remained in place was the certainty that if Lynch's wife predeceased him, then his children would inherit though intestacy.

When Williams was asked about Lynch twice (2014 and 2018) leaving his wills without a successor legatee, Williams testified:

> Q: Well, why, well if he was so adamant, why didn't you say, hey, you've got to name somebody else? I mean, I -
>
> A: I said it a couple of times. He just said, look, I'm not, he sat there in his overalls, and he was a little overweight and he pointed and goes, there's no way. I mean, I know you are telling me he survived two wives or whatever. But that was just, that was just John Lynch. I can, I feel confident by him not doing anything, he still did not intend for it to go there.

What Lynch intended is best discerned from his actions, not from what others "feel" he may have intended. Lynch continued to fully understand the fact that his children would inherit his property if his spouse predeceased him, as confirmed by his Williams who testified:[6]

> Q: He thought he would go first?
>
> A: Yes.

---

[6] R. P. 995-96.

4

Q: All right. Now at the time that you spoke to him about his Will, which I'm assuming was in 2018, was he aware of what would happen if he didn't name alternate legatees and Kathy died before him?

A: Yes, I think he was.

Q: Okay. And so, he knew that if he didn't name alternate legatees of his estate would fall intestate to his children and grandchildren?

A: Well, yes. He was convinced he would not survive. We basically both times, in '14 and '18, pointed to himself and said, look at me, there's no way I'm going to survive them.

***

Q: **But by '18, when he didn't, again, didn't name an alternate legatee, he had already outlived** ——

A: Right.

Q: -- **two wives. Yes**?

A: Yes.

Q: And so, and **he did know** that if he didn't name an alternate, there was no alternate, **that his estate would fall to his children** and grandchildren?

A: I think so.

(emphasis added)

In addition to access to legal counsel who explained the law and effect of Lynch's last two wills, Lynch also received opinions and suggestions on the topic from his neighbors, the Crosslins. Crosslin testified that Lynch told them about the provisions of his will, and she and her husband advised him to have an alternate beneficiary. Lynch heard their suggestions, but he did not any take action to name an alternate legatee to the exclusion of his children. That consistent position by Lynch should be recognized and honored.

**The "Telephone Call" Was Not About Estate Planning**

The district court and majority rely on the August 26, 2021 telephone call to support the argument that Lynch intended to disinherit his children in favor of his friends, which his friends simply implemented for him. I respectfully disagree. The telephone call, which was only partially recorded and is somewhat inaccurately transcribed, was initiated because Lynch trusted Nolin to look after his property, and it needed to be looked after. During the time Lynch had been hospitalized, his trailer had been broken into and items stolen. The record confirms the telephone call was not started as an estate planning conference but, rather, was intended as a discussion of actions needed to be taken while Lynch was in the hospital to protect his assets.

Nolin testified about the purpose of that telephone call with Lynch:[7]

> I had told him that things were not good at his farm, you know. It was being broken into. **And we needed to do something, so if you got out of the hospital that you would have something left when you got there**, you know. So that's, that's when he told me to take care of things.

(emphasis added). Importantly, everyone participating in the telephone conversation expected Lynch to get out of the hospital, including Lynch himself, who commented, *"I'll be out of here in the next two days."*[8]

Nolin was receiving instructions from Lynch about managing the situation and taking care of his business while Lynch was hospitalized. I assert any attempts to describe the contents of the conversation as Lynch laying out global estate planning wishes is undermined by his response to a question posed by Williams, inquiring about bequests, when Williams asked,

---

[7] R. P. 965-966.

[8] *See* Transcript of telephone conversation between Lynch, Nolin and Williams.

6

"if there was like a charity ultimately you wanted anything to go to," to which Lynch replied, **"Don't iron your dress just yet."** (Emphasis added).

This sentence indicates that Lynch was not intending to permanently deprive himself of any of his assets, and he was not ready to address estate planning. His desire was for Nolin to help him manage the assets, like his guns and trailer, that were being vandalized. Lynch never <u>initiated</u> any discussion in detail about who was to inherit what, and Lynch was only responding to questions posed to him on the subject by Nolin and Williams. This was not a discussion with his attorney to draft a new will or any action <u>other than</u> secure his property and look after his business until he was discharged. It is not clear that Lynch even knew Williams was present for the telephone call during the beginning. *"Don't iron your dress just yet!"*

**"The Plan" Fails to Satisfy the Agent's Fiduciary Duties**

After the afternoon telephone conversation with Lynch on August 26, 2021, Williams set about drafting the documents regarding what he believed Lynch's desires were – to prevent his children from acquiring his property through intestacy. Confronted with a hospitalized patient during COVID-19, Williams devised the plan to use the existing 2018 power of attorney to convey most of Lynch's Louisiana assets into a trust to prevent his children from inheriting those assets via intestacy, but was not limited to only this course of action. When Williams was asked why he did not draft a new will to accomplish Lynch's desires to disinherit his children, Williams replied "I didn't have time."[9] Williams confirmed he did not try to get Lynch to sign

---

[9] R.P. 1010.

7

anything personally.[10]  When asked why, Williams responded: "Well, I didn't need to, I had a power of attorney."[11]  I assert, as the comparison of Lynch's words in the transcript with the provisions of the trust illustrate, they are not the same, and the trust is not consistent with Lynch's comments.

Williams' use of the power of attorney is an estate planning "work around" that creates a blueprint that could far too easily be subject to abuse by others with selfish motives who have no qualms of replacing the principal's volition with their own.

I am not implying that Nolin intended anything other than to honor the wishes of his longtime friend, Lynch, in good faith.  The Plan, however, would put Nolin in a position as trustee <u>and</u> beneficiary upon the death of Lynch, whose condition had taken an abrupt turn for the worse in the days after the telephone call.  The record also indicates that Crosslin would not be an obstacle to quickly effectuating the Plan, as she knew and trusted Nolin and Williams and did not seek independent legal counsel to determine the effect of what she was signing.  Nolin and Crosslin, well-meaning friends, collaborated and signed the documents handed to them by Williams, that transferred much of Lynch's property to the trust in less than 24 hours.  The plan was in place and the individuals named as Lynch's agent and trustee/beneficiary were working collectively to effectuate in Lynch's estate plans what they had been advocating for years – exclude Lynch's children.

As the Plan required Nolin to be trustee of the trust, he was required first to decline to serve as agent under the power of attorney, to avoid the

---

[10] At the time there were in place strict visitation policies regarding COVID-19, but alternatives to get documents to Lynch to sign, or instructions for writing an olographic will were not explored or pursued.

[11] R. P. 1011.

8

appearance of self-dealing. Williams presented Crosslin with a document establishing her acceptance of appointment as Lynch's agent, which elevated her role in the Plan. Williams also prepared a trust document, acts of assignment to the trust, and a warranty deed to the trust for Crosslin's signature as agent. The trust document packet was presented to Crosslin for her signature while in her driveway. Crosslin had not participated in the telephone conversation with Lynch the evening before, and she did not initiate the concept of the trust or any other action on behalf of Lynch exercising her new authority. Crosslin testified that after signing the documents that morning, her involvement effectively came to an end. I suggest Crosslin's compliant actions of signing trust documents, assignments, and deeds failed to satisfy her fiduciary duties and duty of care as an agent. How could these actions be in the interest of Lynch when Lynch himself never took any action to implement them? How could Crosslin be certain Lynch wanted his assets to go into a trust and then be distributed to various beneficiaries if she never told him about the plan or discussed his wishes with him personally? Crosslin admits in her testimony that she never talked to Lynch about creating a trust, he never requested a trust, and she never told him she had signed a trust document or deed of his property. [12]

The law of agency establishes a prohibition against self-dealing and a requirement to fulfill with prudence and diligence the mandate accepted. La. C.C. arts. 2998 and 3001. There is a fiduciary duty and a duty of care imposed on the agent. Here, Nolin, who was originally named as the first

---

[12] R. P. 888.

9

alternate agent, was going to name himself as trustee of the trust, which should raise concerns for the objective observer. Crosslin should have investigated and questioned a plan providing that after the death of Lynch, the planned trust agreement would permit Nolin as trustee to distribute any and all of Lynch's assets to himself:

> so much or all of the trust estate, both principal and income, as in the Trustee's (his own) sole discretion is necessary or beneficial for the support, maintenance, health or education of Al. After Grantor's death, **Grantor's primary concern is for the future benefit of Rudy Allen Nolin**, and secondary concern is for the benefit of Arlin Mullen and Irma McDuff.

(emphasis added).

Courts should not condone an agent working in conjunction with another individual – in this case, an alternate agent – to achieve a result that is not permissible. You should not be permitted to do indirectly that which is prohibited directly. I suggest that Crosslin's actions effectively constitute self-dealing on behalf of Nolin, as Crosslin did not independently attempt to meet her fiduciary duty and, instead, signed whatever Nolin and Williams (at this point acting as Nolin's attorney) told her to sign. The duties incumbent on her in her capacity as agent require more, and her failure to meet those duties and ensure the actions are in the interest of Lynch are fatal to the documents.

As Lynch's agent, Crosslin's actions must comport with the authority granted her in the power of attorney, and she must do "whatever may appear to Agent to be conducive to the interest of [John Garner Lynch]." The durable power of attorney granted her the authority to manage the affairs of Lynch, which would remain in effect if, in her words, "something happened to him," such as a stroke, a coma, or incapacity. The only thing the trust

10

accomplishes is to empower her to rewrite how Lynch's estate would devolve after his death. Lynch had politely ignored her recommendations to effectively disinherit his children or add an alternate legatee to his will for at least seven years, and to do anything to the contrary is to replace Lynch's volition with her own. As such, I suggest Crosslin acted outside the authority granted to her as agent, and that the documents relating to the trust, the act of assignment to the trust, the warranty deed, and any other efforts to deprive Lynch's estate of assets solely for the purpose of circumventing our laws of intestacy should be declared null and of no effect.

## Conclusion

In conclusion, my overriding concerns are that despite the good faith, well-meaning intentions of Williams, Nolin, and Crosslin, the result of affirming the trial court creates a blueprint for potential abuse by those without such noble purposes and intent. Effectively a new deviation from Louisiana's exacting requirements for testaments and the effects of our laws of intestacy have emerged, orchestrated by others and resulting in enriching himself, and as a result I must respectfully dissent.